## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

THE FARBMAN GROUP,

        Plaintiff,                            Case No. 03-74975

v.                                            Hon. Gerald E. Rosen

THE TRAVELERS INSURANCE
COMPANIES,

        Defendant.

_____/

## OPINION AND ORDER REGARDING
## CROSS-MOTIONS FOR SUMMARY JUDGMENT

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on    September 28, 2006   

PRESENT:   Honorable Gerald E. Rosen
                    United States District Judge

## I. <u>INTRODUCTION</u>

In the present action, Plaintiff The Farbman Group seeks to recover under a

commercial property insurance policy issued by Defendant The Travelers Indemnity

Company.[1]  Plaintiff's claim under the policy stems from a December 10, 2002 flood at

the premises located at 28601 Lorna in Warren, Michigan (the "Lorna Building"), which

resulted in extensive water damage.  Defendant denied coverage under a "vacancy"

_____

[1]Defendant states that this is the correct name of the company that issued the policy in question, and that the complaint erroneously identifies the insurer as "The Travelers Insurance Companies."

exclusion, citing a lack of tenants in the Lorna Building for at least sixty days prior to the flood. This Court's subject matter jurisdiction is founded upon diversity of citizenship between the parties. See 28 U.S.C. § 1332.

Through the present cross-motions, each party seeks summary judgment in its favor as to the issue of Plaintiff's entitlement to coverage under the policy. In support of its motion, Plaintiff notes that the policy's "vacancy" exclusion does not apply to buildings "under construction or renovation," and it argues that an ongoing project to remove a walkway between the Lorna Building and an adjacent property qualifies as the requisite construction or renovation. Defendant, for its part, argues that this walkway removal project did not entail any "construction" or "renovation" of the Lorna Building, but merely involved some minor repairs to the exterior of this facility after the adjacent walkway had been dismantled. Alternatively, to the extent that the Court concludes that the "vacancy" exclusion does not apply, Defendant seeks partial summary judgment in its favor as to the applicability of the policy's $15,000 coverage limit for mold-related loss or damage, and it also seeks a ruling that Plaintiff is not entitled to the attorney fees sought in its complaint.

These cross-motions have been fully briefed by both parties. Having reviewed the parties' briefs, the accompanying exhibits, and the record as a whole, the Court finds that the relevant allegations, facts, and legal arguments are adequately presented in these written submissions, and that oral argument would not aid the decisional process. Accordingly, the Court will decide the parties' motions "on the briefs." See Local Rule

2

7.1(e)(2), U.S. District Court, Eastern District of Michigan.  This opinion and order sets forth the Court's rulings.

## II.  FACTUAL BACKGROUND

**A.      The Relevant Provisions of the Commercial Property Insurance Policy Issued By Defendant.**

In this case, Plaintiff The Farbman Group seeks to recover under a commercial property insurance policy (the "Policy") issued by the Defendant insurer, The Travelers Indemnity Company.  The Policy insured several of Plaintiff's properties, including a roughly 50,000 square-foot building located at 28601 Lorna in Warren, Michigan (the "Lorna Building").  This Policy had most recently been renewed to cover the period from September 29, 2002 to September 29, 2003.

The disposition of the present cross-motions turns almost entirely upon the proper construction of the Policy's "vacancy" exclusion, which provides:

> If the building or leased premises where loss or damage has occurred has been "vacant"for more than 60 consecutive days before that loss or damage occurs, the Company will not pay for any loss or damage caused by any of the following, even if they are Covered Causes of Loss:
>
> > (1)  Vandalism;
> > (2)  Sprinkler leakage;
> > (3)  Building glass breakage;
> > (4)  Water damage;
> > (5)  Theft; or
> > (6)  Attempted theft.

Buildings under construction or renovation are not considered "vacant".

(Defendant's Motion, Ex. 1, Property Coverage Form, § D(2)(k).)  The Policy, in turn,

defines a property as "vacant" when either (i) "90% or more of the square footage of the
entire building is not rented or is not used to conduct customary operations," or (ii) a unit
or suite rented or leased to a tenant does not contain enough Business Personal Property
to conduct customary operations."  (Id., § G(13).)

**B.    The Removal of the Walkway Between the Lorna Building and an Adjacent
        Property**

        In January of 1985, a wholly-owned affiliate of Plaintiff, J-3 Associates, leased the
Lorna Building to General Motors Corporation, which in turn subleased the building to its
subsidiary, Delphi.  Pursuant to the terms of this lease, General Motors constructed an
enclosed walkway, approximately 100 feet long and 12 to 20 feet wide, that connected the
Lorna Building to the Wickes Building, an adjacent property also occupied by General
Motors.  In constructing this walkway, General Motors removed a set of exterior doors
from the Lorna Building and replaced them with interior-style doors connecting the
building to the walkway.  The walkway rested on its own concrete foundation, and its
exterior walls were constructed with a facade that was intended to match the exterior of
the Lorna Building.  In order to attach this walkway to the Lorna Building, a portion of
the building's facade was chipped away, (see Plaintiff's Motion, Ex. 3, Calfee Dep. at
15), and the building and walkway evidently were connected simply by abutting the two
structures and caulking the points where the walkway touched the building, (see
Defendant's Motion, Ex. 4, Bailey Dep. at 12).

        General Motors' lease of the Lorna Building expired on June 30, 2001 and was not

renewed.  Under the terms of this lease, General Motors was responsible for removing the walkway and "restoring the premises to their condition immediately prior to the construction of said passageway."  (Plaintiff's Motion, Ex. 1, Lease, Ex. B.)  Accordingly, General Motors retained North American Dismantling to remove the walkway, and this firm, in turn, subcontracted certain portions of the project to Pacheco Construction Services.

Removal of the walkway began in November of 2002.  North American Dismantling's project manager, Thomas Bailey, testified that the removal of the walkway necessitated some "dress-up work" on the Lorna Building, including some "cosmetic patch[ing]" of portions of the exterior of the building that had been damaged or otherwise affected by the attachment of the walkway to the building.  (Defendant's Motion, Ex. 4, Bailey Dep. at 14-15.)  In general, Bailey described his tasks as demolition of the walkway and restoration of the two buildings to the state they were in prior to the construction of the walkway.  (See id. at 15.)

Similarly, Pacheco Construction's owner and project manager, Lawrence Calfee, characterized the project as entailing the demolition of the walkway, the restoration of the two buildings' facades to "an acceptable condition," and the restoration of any sidewalks, doors, landscaping, and the like that had been altered or removed in the course of constructing the walkway.  (Plaintiff's Motion, Ex. 3, Calfee Dep. at 6.)  Calfee described the various aspects of this project as follows:

There was — that whole front area consisted of pouring new concrete for

5

sidewalk egress from the building and walkway to where the doors are, the
entrance to the building. We had to — . . . the facade of that building had
fluted facade blocks . . . . [W]e had to figure out a way to make the facade
look decent plus repair what you would consider a soffit area that extends
away from the building, provides almost like a little roof, like a covered
walkway, but it's still part of the building.

* * * *

. . . . We decided that rather than try to install new fluted blocks, which
would have involved some substantial work to tear them off the building,
that if it was okay with the owner that we would fill that in smooth. And
where there were like across the top — some of those fluted blocks were
not damaged, but in order for continuity and the way the building would
look better, we also chipped out flutes so we could then go back over with a
concrete finish so that it looked like it was designed that way.

* * * *

. . . . Then we also — what's not on this drawing in the soffit that covers
part of the entrance to the building . . . . [W]e had to also repair, you know,
that portion of it too. So we had to bring in new chipboard, concrete board
for exterior use, plaster it and so on.

(Id. at 13-15.)[2]

## C.    The Water Damage Sustained at the Lorna Building

On the morning of December 10, 2002, while the walkway removal project was

still underway, Lawrence Calfee received a call from a subcontractor informing him that

_____

[2]In its response to Plaintiff's motion, Defendant complains that Plaintiff has cited both
Calfee's deposition testimony and an affidavit executed by Calfee prior to his deposition.
Defendant suggests that the affidavit should be altogether disregarded, in light of Calfee's
acknowledgment at his deposition that the affidavit is inaccurate in certain respects, and in light
of Calfee's testimony that the affidavit was prepared by Plaintiff's counsel and forwarded for his
signature. As noted by Plaintiff, however, Calfee's affidavit is hardly unique in this latter
respect. In any event, Defendant has not identified any material difference between Calfee's
deposition testimony and his affidavit, and the Court has relied exclusively on the former in
recounting the pertinent facts of this case.

6

water was flowing out of the entrances to the Lorna Building.  Upon arriving at the site about 15 or 20 minutes later and observing the problem first-hand, Calfee contacted one of Plaintiff's representatives.  Plaintiff's property manager, Paul DeBono, went out to the building a short time later and discovered that the entire facility was flooded with approximately three inches of water.  DeBono later determined that a one-inch pipe in the Lorna Building's mechanical room had frozen and burst.

In response to the flooding, Plaintiff arranged for a disaster recovery company to remove the standing water from the building.  In addition, Plaintiff retained a contractor to remove all of the carpet tiles from the entire building, and another contractor opened up the air units at the building in an effort to increase the circulation of air through the facility.  Despite these efforts, Plaintiff alleges that the building sustained approximately $1.9 million in water and related damages.

On January 3, 2003, Plaintiff submitted a claim to Defendant under the Policy, seeking reimbursement for the water damage sustained in the December 10, 2002 flooding at the Lorna Building.  On April 8, 2003, Plaintiff was notified that its claim had been denied, on the grounds (i) that the Lorna Building was "vacant" at the time of the flooding incident, and (ii) that the walkway removal project did not constitute "construction" or "renovation" that would defeat the application of the Policy's "vacancy" exclusion.  After further efforts to reverse this determination proved fruitless, Plaintiff commenced the present suit, alleging that Defendant has breached the Policy and seeking a declaration that it is entitled to coverage under the Policy.

7

## III. ANALYSIS

**A.    The Standards Governing the Parties' Cross-Motions**

Through the present cross-motions, each party seeks summary judgment in its

favor as to its entitlements or obligations under the Policy.  Under the pertinent Federal

Rule, summary judgment is proper "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there

is no genuine issue as to any material fact and that the moving party is entitled to

judgment as a matter of law."  Fed. R. Civ. P. 56©.

This principal issue addressed in the parties' cross-motions concerns the proper

interpretation of the Policy's "vacancy" exclusion.  This is a question of law, and hence is

amenable to resolution under summary judgment principles unless the pertinent Policy

language is found to be ambiguous.  See Klapp v. United Insurance Group Agency, Inc.,

468 Mich. 459, 663 N.W.2d 447, 451, 453-54 (2003).  "The principles of construction

governing other contracts apply to insurance policies," and "[w]here no ambiguity exists,

this Court enforces the contract as written."  Farm Bureau Mutual Insurance Co. v.

Nikkel, 460 Mich. 558, 596 N.W.2d 915, 919 (1999).

**B.    Because the Lorna Building Was Under "Renovation" at the Time of the
       Flooding, the Policy's "Vacancy" Exclusion Does Not Apply.**

In denying coverage for the water damage sustained in the December 10, 2002

flooding at the Lorna Building, Defendant invoked the Policy exclusion for buildings that

are "vacant" for more than sixty days prior to the date that the loss or damage occurred.

8

Plaintiff does not challenge, at least at the present juncture, Defendant's contention that the Lorna Building was "vacant" within the Policy's definition of this specific term, by virtue of all of the General Motors and Delphi employees having moved out of the premises several months, and perhaps over a year, prior to the date of the flooding and water damage.  Nonetheless, Plaintiff asserts that the Policy's "vacancy" exclusion is inapplicable under the circumstances presented here, in light of the express language in the exclusion itself providing that "[b]uildings under construction or renovation are not considered 'vacant'."  (Defendant's Motion, Ex. 1, Property Coverage Form, § D(2)(k).) The Court agrees.

Plaintiff's effort to avoid the application of the Policy's "vacancy" exclusion turns upon the meaning of the words "construction" and "renovation."  Where, as here, "a term is not defined in the policy, it is accorded its commonly understood meaning."  Twichel v. MIC General Insurance Corp., 469 Mich. 524, 676 N.W.2d 616, 622 (2004).  "Reference to a dictionary is appropriate to ascertain what the ordinary meaning of a word is." Popma v. Auto Club Insurance Ass'n, 446 Mich. 460, 521 N.W.2d 831, 836 (1994); see also Morinelli v. Provident Life & Accident Insurance Co., 242 Mich. App. 255, 617 N.W.2d 777, 781 (consulting various dictionaries to ascertain the meaning of a term used but not defined in an insurance policy).  Accordingly, the Court, like the parties, turns first to the dictionary definitions of the terms at issue here.

Beginning with the term "renovation," Webster's Ninth New Collegiate Dictionary (1986) defines the word "renovate" as "to restore to a former better state (as by cleaning,

9

repairing, or rebuilding)." Similarly, the American Heritage College Dictionary (3d ed. 1993) defines this word as "[t]o restore to an earlier condition, as by repairing or remodeling." The most pertinent definition of "renovate" found in the Compact Edition of the Oxford English Dictionary (1971) is "[t]o renew materially; to repair; to restore by replacing lost or damaged parts; to create anew." This dictionary also defines "renovation" as "[t]he action of renovating, or the condition of having been renovated; renewal; restoration; an instance of this, a change effected by renewal."

Under the ordinary meaning that is consistently reflected in each of these various definitions, the Court readily concludes that the walkway removal project underway at the Lorna Building at the time of the December 10, 2002 flooding qualified as "renovation." This project was undertaken pursuant to General Motors' obligation to "restor[e] the premises" to the condition they were in prior to the construction of the walkway. (See Plaintiff's Motion, Ex. 1, Lease, Ex. B.) Similarly, the project managers of the two firms retained to carry out this project, North American Dismantling and Pacheco Construction, characterized their work as entailing the removal of the walkway and the return of each of the adjacent buildings, including the Lorna Building, to approximately the state it was in before the walkway was added. (See Plaintiff's Motion, Ex. 3, Calfee Dep. at 6; Defendant's Motion, Ex. 4, Bailey Dep. at 15.) Each and every one of the above-cited dictionary definitions of "renovation" encompasses this activity of restoring something to a former state or earlier condition. While "renovation" and "restoration" might not be entirely synonymous, it is clear that the former subsumes the latter.

10

The pertinent case law, while quite limited, supports this conclusion.  As the
parties agree, and as the Court's own research has confirmed, there apparently is only one
case in which a court has construed a "vacancy" exclusion with "construction or
renovation" language of the sort at issue here.  In Belich v. Westfield Insurance Co., No.
99-L-163, 2001 WL 20751 (Ohio Ct. App. Dec. 29, 2000), the plaintiff property owners
sought to recover under an insurance policy for water damage sustained when a shower
was left running while they were away in Florida, but the defendant insurer denied
coverage under a "vacancy" exclusion.  The policy in that case, as here, provided that
"[b]uildings under construction or renovation are not considered vacant."  Belich, 2001
WL 20751, at *2.  The plaintiffs argued that this provision was triggered, and thus the
property was not properly viewed as "vacant," by virtue of a tenant's efforts to transform
the property from its former use as a party center to a planned use as a sports bar.

The court found that the plaintiffs had failed to raise an issue of fact as to any
ongoing renovation of the property.  Upon surveying dictionary definitions of
"renovation" and "renovate," the court observed that these definitions did not "accurately
describe[] the process by which one would convert a party center into a sports bar," and
that this activity would be more properly characterized as "remodeling."  Belich, 2001
WL 20751, at *3; see also New Market Acquisitions, Ltd. v. Powerhouse Gym, 212 F.
Supp.2d 763, 772 (S.D. Ohio 2002) (opining that the conversion of property from one
fitness facility to another was "best characterized as 'remodeling'" and not "renovation,"
where the project entailed doubling the existing space, knocking down walls, and other

11

activities that went "far beyond what would commonly be considered 'renovation'"). Moreover, while the record included some evidence of planning and preparation for the conversion, the court reasoned that "[r]enovation contemplates something being done *at the building,* not merely planning to renovate, remodel, or refurbish." Belich, 2001 WL 20751, at *3.

Yet, the court also acknowledged that there was some evidence, at least, of activity on the property that could be viewed as renovation. In particular, the plaintiffs cited their tenant's statement in an affidavit that he had removed a stage and coat racks as part of an overall effort to convert the property into a sports bar. The court recognized that "the way the policy is written, even one day of renovation done within the previous sixty days would be sufficient to overcome the vacancy clause," and it found that "[t]he removal of a stage and some coat racks would be sufficient to constitute renovation." 2001 WL 20751, at *3. Nonetheless, the court held that summary judgment had properly been granted to the insurer, where the record failed to disclose ***when*** any such renovation efforts had been made, and thus did not establish that any such activities had occurred within sixty days prior to the property damage. 2001 WL 20751, at *3.

The remaining case law is helpful only by analogy, as it addresses vacancy exclusions that refer to "construction" but not "renovation." In Myers v. Merrimack Mutual Fire Insurance Co., 788 F.2d 468 (7th Cir. 1986), for example, an apartment building was gutted by fire at a time when all of the tenants had moved out and the plaintiff landlord/owner had begun a lengthy and somewhat sporadic renovation project.

12

This process had spanned over a year, with the plaintiff working on the building only on weekends and only about once a month, and he acknowledged that he had last visited the building over a month before the fire.  The defendant insurer denied coverage under a "vacancy" exclusion, but the plaintiff argued that his renovation efforts fell within policy language providing that "a building in process of construction shall not be deemed vacant."  Myers, 788 F.2d at 470.

The court held that the apartment building was not "in process of construction." 788 F.2d at 472.  In so ruling, the court distinguished between "construction" and other activities such as renovation and repair:

> Several state courts have held that in an insurance policy, the term construction does not include repairs, maintenance, reconstruction, renovation and the like to an already existing structure.  Many state courts have made this same distinction in defining the term construction in other contexts.  Moreover, this distinction accords with the probable purpose of this clause.  Such a clause balances a willingness to extend coverage through the construction period with a desire to guard against excessive vandalism that occurs when a dwelling is vacant, and the interpretation urged by plaintiff would intolerably alter this balance by greatly extending the "construction" period to include any time during which some repairs or renovations are being made.  The "construction" period cannot go on forever.

788 F.2d at 472 (citations omitted); see also Vennemann v. Badger Mutual Insurance Co., 334 F.3d 772, (8th Cir. 2003) (holding that the plaintiff's "remodeling and refurbishing projects do not qualify his claim for the 'being constructed' exception to the vacancy exclusion clause," where "the remodeling must consist of 'substantial continuing activities' to fall under this exception" but the plaintiff's projects were "discrete" and

13

"relatively minor"); TRB Investments, Inc. v. Fireman's Fund Insurance Co., 31 Cal.
Rptr. 3d 384, 391-92 (Cal. Ct. App.) (finding that "the plain meaning of the word
construction, in its ordinary and popular sense, does not include steps taken to renovate an
existing building," and observing that "if the policy had wanted to include renovations as
an exception to the vacancy exclusion, it would have said so"), review granted, 120 P.3d
1052 (Cal. 2005); Salem v. First Financial Insurance Co., No. 73593, 1998 WL 827598,
at *4 (Ohio Ct. App. Nov. 25, 1998) (observing that "[t]he term 'under construction' in an
insurance policy . . . has been construed to refer to the building or erection of something
new," and "does not include repairs or renovations to property which already exists").
But see Warren Davis Properties V, L.L.C. v. United Fire & Casualty Co., 111 S.W.3d
515, (Mo. Ct. App. 2003) (concluding, contrary to the above-cited authority, that
"activities encompassing the renovation of a building are construction").

The Court views these decisions as supportive of its conclusion that the Lorna
Building was undergoing "renovation" by virtue of the removal of the adjacent walkway
and the restoration of the building to its former condition. The above-cited case law
generally distinguishes between "construction" and other activities such as restoration,
renovation, remodeling, and repair, with the former held to entail the building of a new
structure or, at a minimum, substantial structural improvements to an existing building.
While this distinction is not especially helpful to the present task of determining whether
the restoration and repair of the Lorna Building qualified as "renovation," it nonetheless
is evident from these decisions that the additional reference to "renovation" in the

14

Policy's vacancy exclusion served to significantly expand the circumstances under which the Lorna Building would not be considered "vacant."  In contrast to the property owners in <u>TRB Investments</u>, <u>supra</u>, 31 Cal. Rptr. 3d at 392, Plaintiff here ***did*** successfully bargain for policy language that overcame the "vacancy" exclusion in the event that Plaintiff's building was under ***either*** construction ***or*** renovation.

Moreover, the reasoning of these decisions, coupled with the plain meaning of the word "renovation," defeats all of Defendant's various assertions as to why this term should not encompass the work done to the Lorna Building.  First, Defendant insists that the building was under repair, not renovation, because the work being done largely entailed only the "dress up," repainting, and mortaring of certain portions of the exterior of the building where it had abutted the walkway.  Yet, as confirmed in the several above-cited dictionary definitions, repairs that are ***directed at*** the restoration of property to its former state are considered "renovations."  Thus, to assert that the Lorna Building was under "repair" does not preclude these same activities from qualifying as "renovation."  Contrary to Defendant's contention, "renovation" need not entail an improvement, addition, or upgrade to the property.

Indeed, Defendant's own attempts to distinguish between activities that qualify as "renovation" and those that are mere "repairs" illustrate the difficulty of formulating any bright-line rule that would exclude the activities at issue here.  In one of its submissions to the Court, Defendant cites rewiring, a new roof, or "some other capital improvement" as examples of "renovation."  (Defendant's Motion, Br. in Support at 14.)  Many,

15

however, would consider such projects to be examples of "repair" or "remodeling" rather than "renovation," depending on the precise nature and purpose of the work being done. This merely confirms, in the Court's view, that there is an appreciable overlap among these various terms, and it is clear that "renovation" lies somewhere in the middle of the spectrum that spans between "repair" and "remodeling."  See New Market Acquisitions, 212 F. Supp.2d at 772 (opining that the activities in that case were too extensive to be considered "renovation," and were better characterized as "remodeling").

The definition of "renovation" proposed by Defendant's claims adjuster fares no better.  In an April 8, 2003 letter informing Plaintiff that its claim had been denied, Defendant's representative explained that "any work on the exterior of the building which did not render the building uninhabitable to tenants or endanger or affect the overall structure of the building is not sufficient to constitute construction or renovation as contemplated by the policy."  (Plaintiff's Motion, Ex. 13, 4/8/2003 Letter at 2.)  Again, there is nothing in the definition of "renovation" that would mandate such extensive activity as to render a building uninhabitable or affect its overall structure.  To the contrary, the courts have cited precisely these factors of habitability and structural alteration as grounds for distinguishing "construction" from "renovation."  See, e.g., Vennemann v. Badger Mutual Insurance Co., No. 02-64, 2002 WL 31163077, at *2 (D. Minn. Sept. 26, 2002), aff'd, 334 F.3d 772 (8th Cir. 2003); TRB Investments, 31 Cal.

16

Rptr. 3d at 391-92.[3]

Neither can the Court accept Defendant's more general proposition that the activity at the Lorna Building failed to reach some unspecified quantitative threshold that would have qualified it as "renovation." Because the walkway merely abutted the Lorna Building and was not physically "tied in" to it, Defendant maintains that the removal of the walkway necessitated only "minor work" to the exterior of the building that could only be termed "repairs." Even assuming, however, that the work could appropriately be characterized as "minor,"[4] the dictionary definitions of "renovation" do not demand that the activity in question exceed any particular level of substantiality. Indeed, the court in Belich was prepared to accept "[t]he removal of a stage and some coat racks" as "sufficient to constitute renovation," but the plaintiffs failed to produce evidence that such activity had occurred within sixty days of the water damage. Belich, 2001 WL 20751, at *3.

To be sure, the Court acknowledges that an activity could be so minimal in its degree or scope as to fail to constitute "renovation." Replacing a single light fixture with

_____

[3]Indeed, one of Defendant's property claims representatives, Dwight Drysdale, drew a similar distinction in his deposition testimony, characterizing "construction" as entailing a "large change" while "renovation" included such "[n]onstructural" or "cosmetic" work as "new carpet, new wallpaper, [and] things of that nature." (Plaintiff's Motion, Ex. 8, Drysdale Dep. at 36.)

[4]As noted earlier, the deposition testimony of Lawrence Calfee indicates that the work done to the exterior of the Lorna Building entailed somewhat more than merely filling in a few holes and dabbing on a bit of paint. In addition, Calfee testified that some work was done to sidewalks, doors, and other elements of the building's entryway and immediate surroundings in order to restore it to the state it was in prior to the attachment of the walkway.

17

one used in a bygone era might not qualify, for instance, even though one could argue that it served a restorative purpose (and hence constituted renovation).  As Plaintiff points out, however, the activity at the Lorna Building was sufficiently extensive to serve the evident purpose of the "construction or renovation" exception to the Policy's "vacancy" exclusion — namely, to guard against vandalism and other risks associated with a vacant building by ensuring that someone was regularly on the premises.  See Myers, 788 F.2d at 472; TRB Investments. 31 Cal. Rptr. 3d at 392-93.  In carrying out their walkway removal and building restoration tasks, workers were on site on a daily basis during the entire period surrounding the December 10, 2002 flooding, from November 5 until December 22 of that year.  (See Plaintiff's Motion, Ex. 3, Calfee Dep. at 9-11; Defendant's Motion, Ex. 4, Bailey Dep. at 22.)  Under these circumstances, this case presents no occasion to decide whether the commonly understood meaning of "renovation" might exclude "de minimis" levels of activity.

The remaining facts and considerations emphasized in Defendant's briefs have no conceivable bearing upon the issue of contract interpretation that is presently before the Court, and thus warrant little discussion.  First, Defendant stresses that General Motors "controlled" the walkway between the Lorna and Wickes buildings, and that General Motors, rather than Plaintiff, was responsible for and exercised control over the walkway removal project.  Yet, nothing in the Policy required that *Plaintiff itself* be directly engaged or involved in the process of construction or renovation — the Policy provides simply that "[b]uildings under construction or renovation are not considered 'vacant'."

18

Similarly, regardless of whether the walkway could be considered "physically connected to" or otherwise a "part of" the Lorna Building, the relevant Policy language would nonetheless be satisfied so long as the walkway removal project entailed "renovation" to the building itself.  Because Defendant does not (and cannot) dispute that work was performed on portions of the building itself, such as its facade, and because the Court already has concluded that this work qualified as "renovation," it simply does not matter whether the activities pertaining solely to the walkway did or did not separately qualify as "renovation" under the Policy.[5]

**C.     Defendant Is Entitled to Summary Judgment in Its Favor as to the Policy Limit on Mold-Related Loss or Damage and the Availability of Attorney Fees.**

Finally, in the event that the Court were to conclude, as it now has done, that the Policy's "vacancy" exclusion does not apply to Plaintiff's claim, Defendant argues that Plaintiff's recovery should be limited in two respects.  Plaintiff has failed to respond to these arguments in any substantive way.  Accordingly, the Court finds that Defendant is entitled to summary judgment in its favor on these issues.

First, Defendant contends that Plaintiff's potential recovery is diminished by a Policy provision that limits liability for mold-related loss or damage to $15,000.  In response, Plaintiff does not suggest any reason why this provision might not apply, but instead asserts that its recovery *exclusive* of mold-related loss or damage remains

---

[5]By the same token, the Court need not decide whether the activities at the Lorna Building constituted "construction," in light of its conclusion that these activities qualified as "renovation."

substantial — over $1.5 million by its estimate, or nearly $400,000 according to Defendant's estimate. Evidently, then, Plaintiff concedes that the Policy's $15,000 cap upon mold-related damages is applicable here.

Next, Defendant argues that Plaintiff has failed to identify any legal basis for the award of attorney fees sought in its complaint. Again, Plaintiff has not responded whatsoever to this contention. Consequently, the Court finds as a matter of law that attorney fees are not recoverable in this case.

2:03-cv-74975-GER   Doc # 19   Filed 09/28/06   Pg 21 of 21   Pg ID 961

**IV.  CONCLUSION**

For the reasons set forth above,

NOW, THEREFORE, IT IS HEREBY ORDERED that Plaintiff's motion for

summary judgment is GRANTED.  IT IS FURTHER ORDERED that Defendant's

motion for summary judgment is GRANTED IN PART and DENIED IN PART, in

accordance with the rulings in this opinion and order.


                                        s/Gerald E. Rosen_____
                                        Gerald E. Rosen
                                        United States District Judge

Dated:  September 28, 2006

I hereby certify that a copy of the foregoing document was served upon counsel of record
on September 28, 2006, by electronic and/or ordinary mail.

                                        s/LaShawn R. Saulsberry_____
                                        Case Manager